IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTINE SECILIA, | : |
| | : |
| Plaintiff, | :     No.    25-cv-1755 |
| | : |
| v. | : |
| | : |
| COMMUNITY COLLEGE OF ALLEGHENY COUNTY, QUINTON BULLOCK, individually and in his official capacity, ANDRE MITCHELL, and BRIAN JOHNSON, | :     **JURY TRIAL DEMANDED** |
| | : |
| Defendants. | : |

## **COMPLAINT**

Plaintiff Christine Secilia ("Dr. Secilia") hereby file this Complaint as follows:

### INTRODUCTION

1. CCAC (defined *infra*) engaged in a course of conduct intended to discriminate and/or retaliate against Dr. Secilia because of her race and/or gender, culminating in it ending her employment at CCAC without justification, and replacing her with an African American male. To further her economic and emotional injury, CCAC, and others individually, defamed Dr. Secilia by falsely labeling her as a criminal suspect and publishing a "mugshot" of her throughout CCAC in connection with the termination of her employment. The foregoing conduct violated Dr. Secilia's constitutional rights under the First and Fourteenth Amendments, as well as pendent state laws, and was the direct and proximate result of her economic and emotional injuries.

### JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to the First and Fourteenth Amendments to the United States Constitution under the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983 ("Section 1983"), Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981,

as amended ("Section 1981"), as well as 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

3. Venue is proper pursuant to 28 U.S.C. § 1391(b) because each claim arose in the Western District of Pennsylvania and because Dr. Secilia resides in this District.

**PARTIES**

4. Dr. Secilia is an adult individual residing in the Western District of Pennsylvania.

5. Defendant Community College of Allegheny County ("CCAC") is an institution of higher learning with a principal place of business at 800 Allegheny Avenue, Pittsburgh, Pennsylvania 15233. At all relevant times, CCAC was acting by and through its duly authorized administrators, agents and/or employees, who at all relevant times were acting within the course and scope of their employment, under the color of state law, and/or per CCAC's policies, customs and practices.

6. Defendant Quinton Bullock ("Bullock") is an adult individual residing in the Western District of Pennsylvania. At all relevant times, Bullock was the President of CCAC and the final decisionmaker for CCAC. At all relevant times, Bullock was acting within the course and scope of this employment, under the color of state law, and/or per CCAC's policies, customs and practices. Bullock is African American.

7. Defendant Andre Mitchell ("Mitchell") is an adult individual residing in the Western District of Pennsylvania. At all relevant times, Mitchell worked for Allied Universal Security Services at 200 Fleet Street, Suite 200, Pittsburgh, Pennsylvania, 15220, on behalf of, and under the supervision and control of, CCAC. At all relevant times, CCAC provided Mitchell with a private office on its Allegheny County campus. At all relevant times, Mitchell was acting within

the course and scope of this employment, under the color of state law, and/or per CCAC's policies, customs and practices.

8. Defendant Brian Johnson ("Johnson") is an adult individual residing in the Western District of Pennsylvania. At all relevant times, Johnson worked for CCAC as the Interim Executive Director of Safety and Security/Chief of Police. At all relevant times, Johnson was acting within the course and scope of this employment, under the color of state law, and/or per CCAC's policies, customs and practices.

**EXHAUSTION**

9. Dr. Secilia is exhausting all administrative remedies before the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") at *Secilia v. Community College of Allegheny County*, No. 533-2025-01901.

**FACTS**

10. CCAC employs more than 20 employees.

11. CCAC employed Dr. Secilia as an adjunct professor beginning in January 2012.

12. CCAC promoted her to academic advisor and adjunct professor in 2016.

13. When CCAC promoted Dr. Secilia to academic advisor and adjunct professor in 2016, Point Park University also asked Dr. Secilia to begin working in a part-time teaching role.

14. Dr. Secilia previously graduated from Point Park University with a bachelor's degree in criminal justice and was working towards her master's degree in criminal justice administration at the time.

15. Dr. Secilia notified CCAC's department chair of the opportunity for secondary employment with Point Park University, which is a form of employment that is held in addition to

the individual's primary form of employment, and CCAC approved of her secondary employment position with Point Park University.

16. Dr. Secilia's primary employment has always been with CCAC, and her secondary employment has at all relevant times been with Point Park University.

17. In 2019, Point Park University promoted Dr. Secilia to a lecturer in criminal justice, and then to lecturer and the undergraduate criminal justice coordinator.

18. Upon receiving these promotions, Dr. Secilia again notified her department chair at CCAC, and her continuing secondary employment with Point Park University as a lecturer and department coordinator was approved by CCAC.

19. Throughout her employment with CCAC, Dr. Secilia received excellent performance reviews and was never disciplined or reprimanded by CCAC.

20. In June 2023, and at all times relevant to this action, CCAC promoted Dr. Secilia to the position of Director of Safety and Security/Chief of Police ("Security Director") for its Boyce Campus.

21. As Security Director, Dr. Secilia handled the security department's certifications and training, as well as public safety for CCAC's Boyce Campus.

22. CCAC interviewed Dr. Secilia at least two times in connection with her promotion to Security Director, and her secondary employment with Point Park University was discussed each time; during each interview, CCAC continued to approve of her secondary employment with Point Park University.

23. CCAC also provided a formal orientation to Dr. Secilia for her Security Director position involving the human resources department for CCAC, and at no time did anyone raise

4

concerns with her secondary employment position with Point Park University; on the contrary, her secondary employment was discussed and approved.

24. CCAC leadership is in possession of an email communication stating their formal approval of Dr. Secilia's secondary employment position with Point Park University in 2023.

25. At no time while Dr. Secilia was employed by CCAC did her secondary employment position with Point Park University interfere with her primary employment at CCAC.

26. At all relevant times, CCAC knew of and approved secondary employment for other employees who, like Dr. Secilia, worked in its public safety department.

27. To be sure, in or about May 2024, Andre Henderson ("Henderson"), an African American, who at all relevant times held the position of Executive Director of Safety and Security/Chief of Police at CCAC, asked the entire public safety department at CCAC to fill out secondary employment forms for the College.

28. In response, Dr. Secilia formally submitted her secondary employment form for her secondary employment with Point Park University to Henderson, and it was approved by CCAC.

29. Despite the foregoing, on October 8, 2024, Don Kaminski ("Kaminski"), Associate Vice President of Human Resources at CCAC, met with Dr. Secilia and told her that Bullock disapproved of her secondary employment with Point Park University.

30. Bullock disapproved of Dr. Secilia's secondary employment and no one else's secondary employment in the public safety department.

31. At all relevant times, Dr. Secilia was the only Caucasian female working in the public safety department at CCAC.

32. At the time of this meeting, Kaminski told Dr. Secilia that Bullock personally handed him her personnel file, which also included independent research into her life and career.

5

33. CCAC only targeted Dr. Secilia's secondary employment and no one else.

34. Bullock became the President of CCAC in 2014.

35. As the President of CCAC, Bullock is the final decision-maker for all personnel matters (like hiring, promoting, and firing) at CCAC for director-level positions.

36. Since becoming the President of CCAC, Bullock, who is African American, has been the subject of many charges of employment discrimination for reverse-race discrimination (among other charges of discrimination).

37. Since becoming the President of CCAC, Bullock has consistently replaced multiple Caucasian employees with less qualified African American employees, and he has treated Caucasian employees differently in their employment, subjecting them to negative terms and conditions when compared to African American employees.

38. Bullock also previously approved expenditures of tens of thousands of dollars to privately investigate other CCAC Caucasian employees that he wanted to fire and needed to build cases against for wrongful terminations.

39. The foregoing wrongful terminations relate to at least *Burzachechi v. Bullock, et al.*, Western District of Pennsylvania, No. 18-cv-1541, *Archey v. Bullock*, Western District of Pennsylvania, No. 18-cv-1521, and *Carr v. Bullock, et al.*, Western District of Pennsylvania, No. 19-cv-1133.

40. Similar to those cases for wrongful terminations, Bullock ordered that CCAC personnel investigate the personal and professional life of Dr. Secilia as part and parcel to build a false case against her for termination.

41. Bullock has also been the subject of many claims of retaliation and has a reputation at CCAC for retaliating against those offering an opinion different from his own, taking part in

proceedings concerning allegations of his unlawful behavior, or otherwise lawfully complaining about his behavior or other forms of discrimination at CCAC.

42. There has never been any evidence that Dr. Secilia's secondary employment with Point Park University interfered with her position(s) at CCAC.

43. During her meeting on October 8, 2024, Dr. Secilia told Kaminski that she has been working secondary employment with Point Park University for many years, and that this employment had always been approved by CCAC, to which Kaminski understood and agreed.

44. Kaminski told Dr. Secilia that her secondary employment had always been approved and that he did not know why Bullock was targeting her.

45. Kaminski understood that Bullock was the final decision-maker for any personnel decision concerning Dr. Secilia.

46. Kaminski told Dr. Secilia that his directive from Bullock was to bring everything back to him so that he could make the final decision on Dr. Secilia's position.

47. Without justification, Bullock told Kaminski to give Dr. Secilia an ultimatum that she could either work for CCAC or Point Park University, but that she could not work for both.

48. At all relevant times, Wayne McKenith ("McKenith"), an African American male, who has the same job title and responsibility(ies) as Dr. Secilia at CCAC, was approved by CCAC to work secondary employment with the Millvale Police Department as a patrol sergeant.

49. McKenith has never been disciplined for secondary employment.

50. McKenith was not investigated by CCAC for his secondary employment.

51. McKenith was not given an ultimatum over his secondary employment.

52. McKenith was promoted to Dr. Secilia's position as Security Director as soon as CCAC ended her employment.

7

53. Secondary employment was so prolific among CCAC's certified law enforcement officers that several African American male officers at CCAC asked Dr. Secilia for help finding similar teaching positions with other colleges and universities.

54. CCAC never investigated the secondary employment of its African American officers who worked secondary employment at other colleges and universities.

55. Bullock was the decision maker to promote McKenith into Dr. Secilia's position.

56. Bullock's decision to promote McKenith into Dr. Secilia's position was in line with his pattern and practice of falsely ending the employment of Caucasian female employees only to replace them with African American employees.

57. On October 22, 2024, Dr. Secilia filed a complaint with CCAC's Civil Rights Office, alleging that she was being discriminated against because of her race and gender.

58. In connection with discussions that Dr. Secilia had with her immediate supervisor, Henderson, about her impending situation with her employment, Henderson warned Dr. Secilia that CCAC and/or Bullock was building a false case against her to end her employment, as it had always done in the past.

59. On October 23, 2024, CCAC, through its general legal counsel, Anthony DiTommaso ("DiTommaso"), and at the behest of Bullock, formally issued an ultimatum to Dr. Secilia that she could choose between employment with CCAC or Point Park University, but that she could not simultaneously work for both.

60. No other African American male law enforcement officer was given an ultimatum.

61. No other African American male law enforcement officer was placed under any scrutiny for their secondary employment.

62. Bullock has long used DiTommaso to target Caucasian employees at CCAC for whom he wished to wrongfully terminate their employment.

63. Dr. Secilia continued to complain about the discriminatory treatment she was receiving over her secondary employment, while also continuing to more than satisfactorily perform the functions of the position as Security Director at CCAC.

64. Dr. Secilia filed another formal complaint of discrimination on October 24, 2024.

65. On or about November 3, 2024, DiTomasso hailed Dr. Secilia into a private meeting, at which time he berated and degraded her and demanded that she answer questions related to her secondary employment that had nothing to do with CCAC.

66. Bullock ordered the meeting between DiTomasso and Dr. Secilia.

67. Dr. Secilia asked for a witness to be present at this meeting with DiTomasso because she was fearful of, among other things, race discrimination and retaliation.

68. As soon as Dr. Secilia asked for a witness to be present, DiTomasso, at the direction of Bullock, immediately put her on administrative leave.

69. On November 18, 2024, Brian Johnson ("Johnson"), Interim Executive Director at CCAC, began publicizing that Dr. Secilia had been fired, even before she had been told that by CCAC.

70. CCAC subsequently terminated Dr. Secilia's employment later in the day on November 18, 2024.

71. Dr. Secilia's termination from CCAC became effective on November 29, 2024.

72. As stated above, Dr. Secilia was replaced by McKenith, an African American male who was also working secondary employment while being employed by CCAC.

73. When Dr. Secilia was fired on November 18, 2024, and in connection with her termination of employment, Andre Mitchell ("Mitchell"), Supervisor for Allied Universal Security Services, who was stationed at CCAC's Allegheny County campus, issued a public safety warning announcement and "BOLO" (i.e., be on the lookout) for Dr. Secilia, falsely labeling her as a fugitive criminal.

74. This public safety announcement and BOLO originated from Johnson, who received the directive to issue the same from Bullock.

75. Johnson, who is an African American male, had just been given the position of Interim Executive Director of Safety and Security/Chief of Police at CCAC by Bullock.

76. Mitchell's public announcement also falsely claimed that Dr. Secilia was not allowed on CCAC property, that she was to be physically escorted off the property if seen, and that any observations or contact with her needed to be documented in their police reporting systems for criminal suspects.

77. Mitchell also distributed a "mugshot" of Dr. Secilia as part of his public announcement and BOLO, furthering this false narrative that she was a criminal suspect.

78. The intent of Mitchell and Johnson's false narrative was to falsely label Dr. Secilia as a criminal and/or criminal suspect.

79. Subsequently, Johnson, alone or at the behest of Bullock, sent Brian Perris ("Perris"), patrol officer for the Allegheny County Police Department, an email falsely labeling Dr. Secilia as a potential active shooter threat, falsely claiming that she was armed and dangerous, and falsely saying that added patrols were needed on campus to protect the public from the inherent dangers that she presented.

80. Several hours later, Perris, based on the false information that he received from Johnson, issued a second public safety announcement that falsely labeled Ms. Secilia as a potential active shooter threat, falsely claimed that she was armed and dangerous, and falsely said that added patrols were needed on campus to protect the public from the inherent dangers that she presented.

81. Bullock, Johnson and Mitchell all knew or should have known that their publications were false.

82. McKenith continues to work secondary employment for CCAC while remaining in the Security Director position.

83. Because of the collective defamatory statements made against Dr. Secilia in connection with the termination of her employment, she has been unable to find a comparable security position.

84. As a direct and proximate cause of the collective discriminatory treatment described herein, Dr. Secilia suffered actual economic injury, as well as mental anguish and embarrassment.

## COUNT I

### "Stigma-Plus" Violation under the
### Fourteenth Amendment Pursuant to Section 1983

### (Against All Defendants)

85. All paragraphs herein are incorporated by reference.

86. Defendants defamed Dr. Secilia in the course of her termination of employment by CCAC by falsely stating to others that she was a criminal, criminal suspect, displayed criminality, and/or was engaging in criminal activity, thus tarnishing the good-standing reputation that she earned not only in her career with CCAC, but in her career in public safety.

11

## COUNT II

### Equal Protection Violation under Section 1983

### (Against CCAC and Bullock, Individually)

87. All paragraphs herein are incorporated by reference.

88. As a direct or proximate result of the conduct described herein, Dr. Secilia's employment was ended by these Defendants because of her race and/or gender.

89. All claims for race discrimination under Section 1983 are pled alternatively under Section 1981, to the extent that Section 1981 is the applicable claim instead of Section 1983.

## COUNT III

### Retaliation under Section 1983

### (Against CCAC and Bullock, Individually)

90. All paragraphs herein are incorporated by reference.

91. Defendants terminated Dr. Secilia's employment only after she engaged in protected activity by formally and informally complaining of race and/or gender discrimination at CCAC.

92. All claims for race discrimination under Section 1983 are pled alternatively under Section 1981, to the extent that Section 1981 is the applicable claim instead of Section 1983.

## COUNT IV

### [In the Alternative] Defamation

### (Against All Defendants)

93. All paragraphs herein are incorporated by reference.

94. To the extent any Defendant was acting outside the scope of his or her employment, Defendants published communications that were defamatory in nature, which they knew or

reasonably knew to be false, applied to Dr. Secilia and were understood to apply to Dr. Secilia, causing general and special harm to her.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Secilia requests that this Court grant the following relief where applicable:

    a.    That Defendants be required to compensate her for back pay, front pay and other damages in the form of lost wages, and lost or reduced benefits, with interest until the date of any verdict as to be determined at trial;

    b.    That Defendants compensate her for all other applicable compensatory damages in an amount to be determined at trial;

    c.    Punitive damages in an amount to be determined at trial;

    d.    Attorney's fees and costs; and

    e.    All other relief this Court deems just and proper.

Respectfully submitted,

O'BRIEN COLEMAN & WRIGHT, LLC

/s/ Alec B. Wright
Alec B. Wright
Pa. ID No. 316657

116 Blvd of the Allies
Pittsburgh, PA 15222
(412) 232-4400
alec@ocwjustice.com

*Counsel for Plaintiff*